Filed 11/17/23  P. v. Martinez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRINIDAD VALDEZ MARTINEZ,<br><br>Defendant and Appellant. | F085295<br><br>(Super. Ct. No. VCF282470A)<br><br>**OPINION** |

### THE COURT\*

APPEAL from a judgment of the Superior Court of Tulare County.  Melinda Myrle Reed, Judge.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kari Ricci Mueller and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*Before Levy, Acting P. J., Poochigian, J. and Peña, J.

## INTRODUCTION

A jury convicted defendant Trinidad Valdez Martinez and his codefendants Xavier Ysauro Medrano (also known as Xavier Ysidro Medrano), and Rey Robert Avellanoza of attempted murder, burglary, assault with a firearm, and participation in a criminal street gang. Avellanoza was also found guilty of shooting into an inhabited dwelling; Medrano and Martinez were acquitted of this charge. The jury also found true enhancements alleging premeditation and deliberation, use of firearms, causing great bodily injury, and committing the offenses for a criminal street gang. Each defendant received a substantial state prison sentence, including an indeterminate sentence for the attempted first degree murder conviction.

We previously reversed Martinez's and Medrano's convictions for attempted murder, and, as to all three defendants, we also reversed the gang convictions and the gang enhancements. At resentencing, the court was directed to consider whether to exercise its discretion pursuant to Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620) and Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393), if applicable to any defendant, and consider the application of Senate Bill No. 136 (2019–2020 Reg. Sess.) (Senate Bill 136). We also held Martinez could raise his claim for relief based upon the recent passage of Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) at resentencing. In all other respects, we affirmed the judgments.

After the remittitur issued, the prosecutor elected not to retry Martinez on the attempted murder and active gang participation counts (counts 1 and 5, respectively) and the gang enhancement allegations. Before the resentencing hearing, the trial court held the one-year prior prison term allegations would be vacated and stricken pursuant to Senate Bill 136. At resentencing, the court declined Martinez's invitation to exercise its discretion under section 1385 to dismiss Martinez's prior strikes, citing the number of Martinez's prior convictions, their seriousness, and the serious nature of the current offense. The court then sentenced Martinez to the middle term of three years on the

2.

assault with a deadly weapon charge (count 4), doubled based on the strike convictions, plus the middle term of four years for the personal use of a firearm enhancement. The court struck the five-year prior serious felony conviction enhancement to count 4 pursuant to Penal Code section 1385, subdivision (c)(3)(B). The court also sentenced Martinez to 25 years to life for the burglary conviction (count 2), plus a 10-year upper term enhancement pursuant to section 12022.5 based on the personal use of a firearm enhancement. The court noted it had "stricken the allegation of Penal Code Section 667(a)(1), the additional five years under Penal Code Section 1385 (c)(3)(B)." The court ordered Martinez to pay a restitution fine in the amount of $8,000, and imposed and stayed an $8,000 parole revocation fine. The court also imposed a court operations assessment of $160 and $120 in criminal conviction fees.

In this appeal, Martinez argues and the People agree the court erred in failing to stay the sentence on either the burglary count (count 2) or the assault with a deadly weapon count (count 4) pursuant to section 654, and remand is necessary to permit the court the opportunity to exercise its discretion regarding which count to stay. The parties also agree the court erred in increasing the restitution and parole revocation fines during the resentencing hearing, and it miscalculated the appropriate court operations assessment and criminal conviction assessment. We agree with the parties' contentions.

Martinez also contends the court erred in refusing to strike one of his firearm enhancements at resentencing and the court should not be entitled to reimpose the prior serious felony enhancement it struck during resentencing. Additionally, he challenges the manner in which custody credits are denoted on the abstracts of judgment.

For the reasons stated herein, we vacate Martinez's sentence and remand for the court to conduct a full resentencing hearing during which it should stay Martinez's sentence on count 2 or count 4 and impose no more than a $4,000 restitution fine and a $4,000 parole revocation fine. We further direct the court to correct the court operations

3.

assessment and criminal conviction assessment in light of Martinez's remaining convictions. In all other respects, we affirm the judgment.

PROCEDURAL BACKGROUND

*Initial Proceedings*

An information was filed on May 22, 2013. On July 18, 2013, the trial court denied the defendants' motions to bifurcate the gang allegations and evidence. The first trial ended in mistrial on July 24, 2013. A second jury was sworn and the case commenced on July 30, 2013. On August 9, 2013, the trial court denied the motion of Medrano and Martinez to sever their case from the case against Avellanoza.

*Jury Verdicts*

On August 9, 2013, defendants Martinez, Medrano, and Avellanoza were all convicted of attempted murder (Pen. Code, §§ 664, 187, subd. (a); count 1), first degree burglary (§ 459; count 2), assault with a deadly weapon, a firearm (§ 245, subd. (a)(1); count 4), and street terrorism (§ 186.22, subd. (a); count 5). Avellanoza was convicted of shooting into an inhabited dwelling (§ 246; count 3); Martinez and Medrano were acquitted of this charge. (Undesignated statutory references are to the Penal Code.)

The jury found true conduct enhancements that all three defendants committed attempted murder willfully, deliberately, and with premeditation. The jury also found true allegations that in committing count 1, Martinez and Medrano had violated section 12022.53, subdivisions (b) and (c) for personal use of a firearm as alleged in count 1, but did not find true Medrano and Martinez acted as principals or caused great bodily injury to the victim pursuant to section 12022.53, subdivisions (c) and (e)(1) and (d) and (e)(1). The jury found true the allegations Avellanoza personally used a firearm in count 1 within the meaning of subdivisions (b) and (c) of section 12022.53, he acted as a principal, causing great bodily injury within the meaning of subdivisions (c) and (e)(1) and (d) and (e)(1) of section 12022.53, and he inflicted great bodily injury pursuant to section 12022.7, subdivision (a). The jury found true the allegations all three defendants

4.

used a gun within the meaning of section 12022.5, subdivision (a) as to counts 2, 4, and 5, and all three defendants acted in counts 1 through 4 for the benefit of a criminal street gang in violation of section 186.22, subdivision (b)(1)(C).

In a bifurcated proceeding, the trial court found true allegations that Martinez was subject to status enhancements for committing four prior strikes pursuant to the three strikes law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), suffering four prior serious felony convictions (§ 667, subd. (a)(1)), and serving five prior prison terms (§ 667.5, subd. (b)).

### Sentencing

Martinez was sentenced on December 19, 2013. The trial court noted Martinez had two or more prior serious or violent convictions and sentenced him to an indeterminate term of 15 years to life, multiplied by three pursuant to the three strikes law, for a term on the attempted murder charge (count 1) of 45 years to life. The court imposed an additional consecutive sentence on count 1 of 20 years for the section 12022.53, subdivision (c) gun enhancement and stayed the remaining enhancements as to count 1. The court sentenced Martinez on the burglary conviction (count 2) to 25 years to life plus consecutive terms of 10 years for the gang enhancement, five years for the prior serious felony enhancement, two years for each of two prior prison term enhancements, and the midterm of four years for the section 12022.5 gun enhancement. The court sentenced Martinez to an aggravated term of eight years for the assault with a deadly weapon conviction (count 4), plus the midterm of four years for the section 12022.5, subdivision (a) enhancement, an additional 10 years for the section 186.22, subdivision (b)(1) enhancement, an additional five years for the section 667, subdivision (a)(1) prior serious felony conviction enhancement, and two years for each section 667.5, former subdivision (b) prison prior enhancement. It stayed Martinez's sentence on count 4 as well as the related enhancements on that count pursuant to section 654. The court ordered Martinez to serve a midterm of four years doubled on the active gang

5.

participation count (count 5) plus the midterm of four years for the section 12022.5, subdivision (a) gun enhancement, to run concurrent to his indeterminate sentence. The remaining section 667, subdivision (a)(1) and section 667.5, former subdivision (b) enhancement allegations in count 5 were stayed pursuant to section 654. Martinez was ordered to pay a restitution fine of $4,000 and an additional $4,000 parole revocation fine was imposed and stayed pursuant to section 1202.45. Martinez was given credit for 1,117 actual days and 167 conduct credits pursuant to section 2933.1, for total credit of 1,284 days.

***Previous Appeals***

The defendants were partially successful in their appeal of the judgment. (See *People v. Medrano*, review granted Feb. 1, 2017, S238692.) The California Supreme Court granted Martinez's and Medrano's petitions for review pending consideration and disposition of *People v. Mateo*, review granted May 11, 2016, S232674, transferred to the court of appeal March 13, 2019. The Supreme Court denied Avellanoza's petition for review (remittitur issued Feb. 7, 2017). On April 10, 2019, the California Supreme Court returned the case to us with directions to vacate our opinion and reconsider the cause in light of Senate Bill 1437. In connection with the Supreme Court's transfer, the remittitur pertaining to Avellanoza was recalled on October 8, 2019. In supplemental briefing, Martinez and Medrano then argued the enactment of Senate Bill 1437 required reversal of their attempted murder convictions because the jury instructions and the prosecutor's arguments allowed the jury to convict them on the repudiated theory that attempted murder was a natural and probable consequence of aiding and abetting assault likely to cause bodily harm and because section 188 no longer permits imputed malice. Relatedly, they argued Senate Bill 1437 applied to charges of attempted murder and that relief should be available through direct appeal, rather than limited to the petitioning procedure provided for in newly enacted section 1170.95, now section 1172.6. Martinez further contended the trial court should be permitted to exercise its newfound discretion to strike

6.

or dismiss the firearm enhancements imposed pursuant to sections 12022.5 and 12022.53 (Senate Bill 620), and the five-year prior serious felony enhancement imposed pursuant to section 667 (Senate Bill 1393).

We previously found merit to Martinez's and Medrano's claims pertaining to the natural and probable consequences doctrine. We concluded Senate Bill 1437 not only abrogated the continuing application of this doctrine to murder charges, we determined this change in the law also applied to attempted murder charges premised on this doctrine. We held former section 1170.95's petitioning procedure did not apply to Martinez and Medrano for their convictions of attempted murder, but we reviewed their claim under *In re Estrada* (1965) 63 Cal.2d 740 and concluded they were entitled to relief on direct appeal. We further concluded Martinez and Medrano were entitled to reversal of their attempted murder convictions.

The People then petitioned for review. The California Supreme Court granted and held the petition and deferred action pending its consideration and disposition in *People v. Lopez*, review granted November 13, 2019, S258175. It then transferred the case back to us with directions for our court to vacate our decision and reconsider the cause in light of Senate Bill No. 775 (2021–2022 Reg. Sess.). We again reversed Martinez's and Medrano's convictions for attempted murder, and remanded for further proceedings. As before, as to all three defendants, we also reversed the gang convictions and the gang enhancements and directed the trial court that, at resentencing, the court should consider whether to exercise its discretion pursuant to Senate Bills 620 and 1393, if applicable to any defendant, and consider the application of Senate Bill 136. We also held Martinez could raise his claim for relief based upon the recent passage of Assembly Bill 518 at resentencing. In all other respects, we affirmed the judgments.

After the remittitur issued, the prosecutor elected not to retry Martinez on counts 1 and 5 and the gang enhancement allegations. On July 26, 2022, the court explained the

7.

one-year prior prison term allegations were stricken and vacated now pursuant to Senate Bill 136.

### Resentencing

At resentencing, the court declined Martinez's invitation to exercise its discretion under section 1385 to dismiss his prior strikes, citing the number of Martinez's prior convictions, their seriousness, and the serious nature of the current offense. The court sentenced Martinez to the middle term of three years on the assault with a deadly weapon charge (count 4), doubled based on the strike convictions, plus the middle term of four years for the personal use of a firearm enhancement. The court struck the five-year prior serious felony conviction enhancement to count 4 pursuant to section 1385, subdivision (c)(3)(B). The court also sentenced Martinez to 25 years to life for the burglary conviction (count 2), plus a 10-year upper-term enhancement pursuant to section 12022.5 based on the personal use of a firearm enhancement. The court noted it had "stricken the allegation of … Section 667[, subdivision] (a)(1), the additional five years under … section 1385[, subdivision (c)(3)(B)]." The court ordered Martinez to pay a restitution fine of $8,000, and imposed and stayed an $8,000 parole revocation fine. The court also imposed $160 in court operations assessments and $120 in criminal conviction fees.

FACTUAL BACKGROUND

For purposes of background and context, we include the following factual recitation from our prior unpublished opinion, *People v. Medrano* (Apr. 4, 2022, F068714 & F069260 [2022 Cal.App.Unpub. Lexis 2028; 2022 WL 1000521].

### Shooting Incident

In November 2010, M.M. was living in a mobilehome next to his father's house on a five-acre parcel in southern Tulare County. M.M. described the area as a small community where "all the people know each other." M.M. ran a trucking business on the property with his father. M.M. was growing what he described as medical marijuana

8.

plants in a room on the west side of his mobilehome and in the kitchen area. M.M. grew the plants with bright 600-watt high sodium lights that stayed on 24 hours a day.

Between 10:45 and 11:00 p.m. on November 24, 2010, M.M. heard a truck, looked outside, and became alarmed because he recognized a gray stepside Chevrolet driving by his home at a slow speed. M.M. went back in his home after seeing nothing out of the ordinary. Ten to 20 minutes later a confrontation occurred. M.M. said he did not recall everything exactly because it had been years since the events of that evening. M.M. heard multiple loud footsteps on his porch. Because it was a manufactured home, it was light and the sound of the footsteps was amplified. Also, the home was older and poorly insulated.

M.M. had a 12 gauge shotgun leaning against the closet loaded with dove shot, "really a light load." M.M. heard someone say "FBI" just before kicking in the door and entering. Within seconds, the door to the marijuana grow room was kicked down and then the door to M.M.'s bedroom was kicked down. Since it was Thanksgiving week, M.M. thought the chance it was actually the FBI entering his home was slim. M.M. rolled out of bed, grabbed the shotgun, and crouched down next to his bed. As the assailants entered M.M.'s home, he was crouched down on the right side of a couch in between his bed and the closet. M.M. could see the assailants standing in the doorway. The assailants were about 30 feet away from M.M., and he subsequently identified them as defendants. All three defendants wore black attire and hats.

M.M. told Detective Judd Hembree he had been positioned next to the coat rack, which was M.M.'s closet. M.M. told Detective William Meek he had been between the bed and the closet area, "mid way through the bed and mid way through the closet." During his preliminary hearing testimony, M.M. had said he was "'on the ground in the closet,'" but later clarified at trial he was next to the closet. At trial, M.M. explained the detectives had determined M.M.'s estimate was off one foot from what he had described to them, and he had not tried to lie about his location.

M.M. saw Avellanoza standing in the doorway and was familiar with him because on a prior occasion he had caught Avellanoza breaking into a neighbor's garage. M.M. had seen Avellanoza underneath his neighbor's classic 1960's car trying to strip it. On that occasion, M.M. drew a gun on Avellanoza and made a citizen's arrest until law enforcement arrived.

When defendants came through the home and knocked down M.M.'s bedroom door, it hit a television before landing on the floor. Avellanoza, who was armed with a semiautomatic pistol, pointed the gun at M.M. and fired. M.M. believed he fired his shotgun simultaneously and did not want to split hairs about who fired the first shot.

M.M. felt shots fired all around him. Events happened very fast. Three or four bullets grazed his body but only one bullet penetrated him, going straight through his shoulder. The wound bled a little. M.M. did not seek medical attention for the wound because he was too afraid for his family's safety to leave the property. Investigating deputies took pictures of the wound an hour or an hour and a half after the incident. A photograph depicting M.M.'s injury was admitted as exhibit 17. The wound became infected, was painful, and limited M.M.'s activity for a few days.

Both of the interior doors of the mobilehome had been knocked completely off the hinges, which made M.M.'s view into the grow room "a thin but clear view." M.M. saw Medrano and Martinez in the grow room. M.M. also recognized them from prior encounters.[1] Medrano and Martinez were each carrying handguns. Additional gunfire was directed toward M.M. through the wall of his bedroom by defendants as they exited the home.

M.M. further described his view of Medrano and Martinez as a "glimpse." After the shots were fired, M.M. could see Medrano and Martinez fleeing from the grow room.

---

[1]On one occasion M.M. was exiting a convenience store as Medrano and Martinez were entering it. Martinez made a gesture toward Medrano and two kids, who then jumped on M.M. When bystanders tried to help M.M., Martinez pulled out a gun and the bystanders backed away.

M.M. elaborated that he saw Medrano and Martinez for a "split second," but this was all he needed to identify them. After they left the grow room, M.M. heard someone say, "'Go back in,'" or "'Go back in and get him.'" In his preliminary hearing testimony, M.M. had testified he heard someone say, "'Go back in and get that fool.'" M.M. believed it was Martinez who made this comment.

M.M. was trying to maneuver himself out of the bedroom while ducking and dodging bullets. He exited the room from a window not far from where he had been crouched. Although M.M.'s shotgun became jammed, he was able to clear it while exiting through the window. A fourth gunman standing by a tree started shooting at M.M. M.M. fired back at him. M.M.'s elbow got skinned and he was in a panic. M.M. saw four or five people jump into a white car and drive away. M.M. was not certain but believed he placed his shotgun in a vehicle he owned.

M.M. did not immediately tell officers the names of the assailants until later in the first day of the investigation. M.M. explained it took a while to build the courage to tell investigating officers the identities of the assailants because he was still worried about his family's safety. M.M.'s father testified he remembered his son remarking after the incident that he did not see the assailants, and he had not identified (to his father) who they were.

*Investigation*

Detective William Meek of the Tulare County Sheriff's Department investigated the shooting incident. Meek found and photographed wadding from fired shotgun shells and casings from different caliber gun ammunition in M.M.'s mobilehome. The wadding came from 12 gauge shotgun ammunition. Inside the bedroom closet area there was 12 gauge wadding and some birdshot. Casings in the home and within the fenced area of the home came from nine-millimeter, .40-caliber, and .45-caliber ammunition.

Photographs of bullet holes in the walls of the dining room and in the master bedroom closet wall shared between the two rooms, as well as in the walls of the living

11.

room, washroom, kitchen, master bedroom, and hallway were admitted into evidence. Patterns of some of the holes in the bedroom closet were consistent with bird shot pellets. Photographs of damage to the front and interior doors of the home were also admitted into evidence. The grow room lighting in the mobilehome provided sufficient light for Meek without having to use his flashlight. Three separate shoe tracks were discovered by tire tracks near the roadway.

Meek attempted to mimic M.M.'s position in the bedroom based on what M.M. had told him. At first, Meek was unable to see the grow room from the position M.M. described. Meek further explained that from a point between the end of the mattress and the first opening of the closet, through a small open space, he could see into the grow room by peeking around "a little bit."

At one point, M.M. told Detective Hembree he did not recognize any voices during the assault and he could have been killed by federal agents. Hembree further explained, however, this was at the beginning of the assault when M.M. heard someone yell "FBI." M.M.'s comment about not recognizing voices did not refer to the end of the incident. When questioned by investigators, M.M. positively identified all three assailants in photographic lineups.

Detective Hembree walked through the crime scene. Detective Meek was arriving at the scene about the same time. An umbrella grow light was suspended above the marijuana plants in the kitchen area and it emitted ambient light as Hembree walked through M.M.'s mobilehome. Hembree could see well throughout the home without additional light. There were grow lights next to M.M.'s bedroom that were also very bright. The bedroom door was broken off its hinges and was propped up against the wall. There was light emanating from the grow room into the bedroom, especially with the door open.

M.M. did not give Detective Hembree a description of the getaway car. M.M. had described the fourth gunman to Hembree as a shadowy figure. Detective Travis Shaw

talked to M.M. almost a month after the incident. At that time M.M. described to Shaw a specific car he had seen driving by his home since the incident, a white Honda Civic with black rims. M.M. suspected his assailants were connected in some way to the Honda. M.M. explained to Shaw that Antonio Valdez, also known as Peanut, drove a white Honda.

From a photographic lineup, M.M. identified the fourth individual by the tree as Peanut. M.M. admitted he only caught a glimpse of Valdez from 30 or 40 feet away, and he had been helped in identifying him by his "guy on the street." M.M. told Shaw he had seen Valdez the day of the incident and "he had talked to a friend of his who was … helping him out" in describing Valdez, and this was how M.M. got Valdez's name.

A search warrant was executed at Medrano's residence on November 30, 2010. Investigators found in Medrano's bedroom a flag depicting a "Huelga bird," a computer screen with the same symbol, a "Nor Cal" flag with a red stripe on the bottom, and drug paraphernalia. Investigators also found a box of ammunition, other live rounds of .38-caliber and .357-caliber bullets, and a holster that could fit firearms of .380-caliber, nine-millimeter, .40-caliber, or other short-barreled guns. There was also a radio scanner in the room used to monitor police and fire channels.

On November 30, 2010, investigators also executed a search warrant at Martinez's residence. Detective Chad Bruce went to Martinez's bedroom where he found a marriage certificate in Martinez's name and a suitcase in the closet with mail addressed to Martinez. Bruce went to Oscar Tellez's room in the same residence and found a collage-style drawing "with a female's face, a clown wearing … a fedora, … a guy wearing a sombrero with [the word] Tellez across the brim." Bruce also photographed and collected from Martinez's room a drawing with the name "Trino" on the bottom right corner with "05" next to it and a clown with a little star on its earlobe. The star is a common symbol among Northerner gang members.

13.

In Tellez's room, Bruce collected a photograph of nine males shown drinking beer. One person in the group was "throwing" gang signs. Martinez was in the picture wearing a red shirt.

When the search warrant was executed, Detective Hembree questioned Martinez in front of his home after Martinez was in custody and had been given and waived his rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Martinez said the day of the shooting was his wife's birthday and they had dinner at Olive Garden in Visalia, had a few drinks, and came home for a few more drinks. Martinez left home to get something more to eat, then came back home for the rest of the evening. During the initial questioning, Martinez did not indicate he left his home a second time to eat again. When later questioned, Martinez added that he left his home a second time to go to Sonic, but came right back home. When asked his gang affiliation, Martinez said, "'I'm still down as a Northerner.'"

### Gang History and Background Evidence

Detective Steven Sanchez testified as the People's gang expert. Sanchez had been a police officer just over nine years and spent the previous year with the violent crimes unit and the four years prior to that with the gang violence suppression unit. Sanchez had advanced training relating to gangs, 300 hours of Police Officers' Standards and Training, and attended state and national conferences on gangs. Sanchez attended several separate classes on Northerner gangs and the Nuestra Familia. Sanchez was also a member of the Central California Gang Investigators Association, the California Gang Investigators Association, and the California Gang Task Force where he attends meetings to learn about current trends with gangs and who is in charge of them.

Sanchez explained the Nuestra Familia was the founding prison gang for the Norteños gang. A current trend with gangs is for them to tax drug dealers selling in their area and to send these funds to jails to provide money to inmates for attorneys, food, and

14.

the commissary. The collected funds are also used to move weapons and narcotics, as well as to establish safe houses to store drugs and weapons.

Sanchez worked in the jail for two and a half years and became familiar with gang tattoos, gang operations in jails, and how gang members communicate with inmates. For a year and a half on patrol, Sanchez worked in Ivanhoe, where there are primarily Southerner gangs, and Goshen, where there are primarily Northerner gangs, familiarizing Sanchez on how the gangs operate on the streets. In the gang unit, Sanchez's primary duty was to document gangs. This made him familiar with everything gang members do, from the music they listen to, the clothes they wear, who they associate with, their enemies, the area they claim, and the signs and symbols they use. Sanchez had consensual contacts with gang members resulting in conversations where he gained much of his knowledge.

Sanchez had investigated over 100 crimes involving the Norteño gang. In the late 1950's, a Sureño gang, La Eme, was formed in the prison system. In the mid-1960's disaffected La Eme gang members who had become tired of politics that did not allow them control of the drug trade formed Nuestra Familia, which founded the Norteño prison gang. The Nuestra Familia and Norteños have a chain of command. Norteño territory has traditionally been from Delano north. Tulare County has been traditionally a very Northerner-affiliated county. The Norteños traditionally claim the color red and the Sureños the color blue. Norteños wear team colors like those of the '49ers and Giants sports teams and also wear Nor Cal clothing.

The Norteños use the hand gestures of one and four to represent Roman numeral XIV, and use the letters NS for North Side. They also use these symbols in graffiti. The Huelga bird is another Norteño symbol. Some of the primary activities of the Norteño gangs include homicide, assault with deadly weapons, carjacking, robbery, narcotics sales, and possession of firearms.

15.

Sanchez explained that in Norteño gang culture, respect and advancement within the gang and with rival gangs are achieved by committing illegal activities, assaulting rival gang members, and causing fear. People who testify against Norteños are considered snitches, and the gang will do everything possible to get rid of such a person to stop further cooperation with law enforcement.

The California Department of Corrections and Rehabilitation (CDCR) has identified seven validated prison gangs, including Nuestra Familia. When prison authorities in the 1980's began to lock down gang members, Nuestra Familia created a faction called Nuestra Raza (referred to by prison officials as the "Northern Structure") to carry out their crimes. Ultimately, the Nuestra Familia controls all of the activities for the Norteño gang. The Nuestra Familia has a paramilitary structure with generals, lieutenants, and regimental commanders who control everything from prison out onto the streets. Sanchez personally executed a search warrant of a residence in Goshen with a safe containing 400 prison "kites," the gang's constitution, the gang's 14 bonds, and a list of how to send money to generals incarcerated in Pelican Bay prison.

When a gang member is convicted of a gang crime, he or she has to register with law enforcement as a gang member pursuant to section 186.30. The gang member receives a "STEP notice" that he or she is a member of the gang, the gang commits illegal activities, and the gang member has to continue registering as a member of that particular gang. Detective Sanchez explained it was becoming more common to find gang members who are not "flying their colors," do not have tattoos, and are not wearing gang clothing because gang members are more aware of gang injunctions being issued in Tulare County.

The Tulare County Sheriff's Department has adopted 10 criteria from the California Department of Justice to demonstrate someone is a documented gang member. To be considered a gang member, the person must meet three of the criteria. The 10 criteria are that the person: associates with gang members, admits gang membership,

16.

admits being a gang member in a custodial facility, wears gang clothing or attire, wears such attire in or possesses gang photographs, writes gang material, possesses gang material, identifies as a gang member in correspondence with another gang member, is identified as a gang member by a reliable source, and has gang tattoos.

### *Predicate Offenses*

The predicate offenses committed by the Norteño gang, shown by certified documentation of prior convictions (exhibits 125 & 126), included an assault with a deadly weapon with a gang enhancement by Norteño gang member George Lua on October 18, 2008. Detective Sanchez himself participated in the arrest of Lua. The second predicate offense occurred on April 10, 2010, when Norteño gang member Salvador Mendoza committed an attempted murder and was charged with that and a gang enhancement. The crime occurred during an altercation between Norteño gang members and a Southerner dropout. No objections were lodged to the admission of exhibits 125 and 126 or to Detective Sanchez's testimony.

### *Evidence of Medrano's Gang Affiliation*

Sanchez conducted research on Medrano's gang activity, reviewing documents pertaining to a drive-by shooting incident on March 24, 2006. Deputies with the Tulare County Sheriff's Department were dispatched to a residence belonging to Juan Marquez, a member of the Norteños. Marquez's mother told detectives a shooting occurred at the residence because of her son's gang affiliation.

In September 2006, sheriff's deputies were dispatched to a residence belonging to a Sureño gang member who identified Medrano and fellow Norteño Tommy Corrales as shooting at him with a shotgun as he drove by Medrano's residence. A search warrant was executed at Medrano's residence where deputies found Norteño graffiti and shotgun shells. This information demonstrated to Sanchez that Medrano was both the victim of a gang-related crime and a member of the Norteño gang.

17.

In November 2006 there was a report of a drive-by shooting at Medrano's residence. Detectives contacted a witness who observed a Norteño gang member get into a car at Medrano's residence and flee the area. There was yet another drive-by shooting at Medrano's residence on December 14, 2006. In September 2009, Medrano was contacted by Officer Chavez of the California Highway Patrol. During the investigation, Chavez "documented Mr. Medrano as having north gang affiliation."

Detective Sanchez was shown exhibit 98, booking information on Medrano indicating he was affiliated with the Norteño gang. The classification was prepared by a correctional deputy, and Sanchez did not know if the classification was based on a statement by Medrano.

Turning to the evidence found in Medrano's residence during the execution of the search warrant, Sanchez noted that detectives, including himself, found multiple items showing indicia of Norteño gang affiliation. Medrano was displaying a Nor Cal flag, a Huelga bird flag, and a computer screen image of "North Side Pixlon" showing his allegiance to the gang. North Side Pixlon is a documented subset of the Norteño gang. A PlayStation 3 was connected to a monitor. Sanchez personally listened to audio files stored on the hard drive of the PlayStation 3 and heard Norteño gang lyrics with gang slurs disrespecting rival gangs. One example was the derogatory term "scraps" in a lyric referring to the rival Sureño gang. Three other people lived in Medrano's residence. Other family members indicated the room where gang indicia was found was Medrano's room. Based on all this information, in Sanchez's opinion Medrano was a member of the Norteño gang.

*Evidence of Martinez's Gang Affiliation*

Two weeks prior to trial, Sanchez was present when photographs of Martinez's gang tattoos were taken and admitted as exhibits 127, 128, 129, and 130. Among the tattoos on Martinez were "Norte," "X4," and the northern star. Exhibit 131 depicted a Huelga bird tattoo and exhibit 132 was a tattoo depicting a female with a headband

18.

bearing the Roman numeral "XIV." Exhibit 133 was a photograph of a tattoo depicting a female with a red bandana across her head with the initials "NS" within the bandana. The letters "NS" represent the North Side. Exhibit 134 was a photograph of a tattoo depicting a bear, emblematic of Northern California and found on Nor Cal clothing.

Sanchez also reviewed documents from the CDCR, previous police reports, and field identification cards related to Martinez. In 1997, Martinez was arrested in the company of Misiel Guzman, a Norteño gang member. Martinez filled out a classification questionnaire indicating Sureño and Bulldog gang members were his enemies. Sanchez "located documents indicating Mr. Guzman was previously a member of the northern structure gang." Documents from CDCR prepared in October 2002 and November 2008 stated Martinez was then an active member of the Nuestra Raza Norteño gang.

In October 2007, Martinez was a passenger during a traffic stop of Norteño gang member Jorge Ceballos. A loaded .45-caliber handgun and three ounces of methamphetamine were found in the front passenger glove box. Investigators also found another ounce of methamphetamine and $10,000 in cash. Martinez filled out a gang questionnaire stating he was associated with Northerner gangs. While in custody in May 2009, Martinez admitted being a member of the Northerner gang. In January 2010, while with Norteño gang member John Escalera, Martinez admitted to law enforcement he was a Northerner gang member.

In November 2010, Martinez was ordered to register as a gang member with the Tulare County Sheriff's Department after being served with a STEP notice. Sanchez saw a photograph depicting Martinez with another male and a female obtained after the execution of a search warrant of Martinez's residence in November 2010. The male was flashing the Northerner gang hand sign "4" and wearing a reddish-color Giants jersey. As noted earlier, after being given his *Miranda* rights when he was arrested, Martinez said he was a Northerner gang member.

19.

Martinez reviewed a report by a witness, Melesio Valdez (also referred to as Melesio Valdez Duran and M.V. during trial), who spoke to Detective Zaragoza. Valdez reported to Zaragoza that Martinez was a shot-caller for the gang, involved in the collection of money for the gang, and directing orders. Shot-callers give permission to fellow gang members to carry out gang activities and are also in charge of sending money to high-ranking gang members.[2]

### Evidence of Avellanoza's Gang Affiliation

Relying on documentary evidence, Sanchez stated that in June 2008, sheriff's department deputies conducted a traffic stop of a vehicle possibly involved in an assault. Avellanoza completed a classification questionnaire in which he self-admitted being a Northerner associate and stated his enemies were Southerners. Reading from another police report, Sanchez testified that on May 29, 2009, Delano Police Department officers were dispatched to investigate an allegation Avellanoza and fellow Norteño gang member Antonio Valdez assaulted a victim in an ongoing dispute over a girlfriend. Avellanoza struck the victim in the left eye. Valdez and Avellanoza were brandishing a firearm.

Another report from the Tulare County Sheriff's Department indicated on June 12, 2009, Avellanoza allegedly brandished a firearm. According to the victim, Avellanoza asked the victim why he was wearing a blue shirt and called the victim a scrap. The victim reported Avellanoza pulled a firearm from his waistband. The victim later requested no charges be filed against Avellanoza. According to Sanchez, this showed Avellanoza's activity in the gang and his desire to confront a perceived member of a rival gang. Sanchez explained it was very common for victims not to seek charges against

---

[2]There was a lengthy hearing outside the presence of the jury in which counsel for Martinez and Medrano challenged the admissibility of the "shot-caller" testimony as being inadmissible hearsay and asserted its introduction violated Evidence Code section 352. The court found this evidence was hearsay that an expert could testify about. The trial court further found that although the evidence was prejudicial, its probative effect outweighed the prejudice.

gang members out of fear of retaliation.  On November 30, 2009, a victim reported to the Tulare County Sheriff's Department that Avellanoza and three other fellow gang members took the victim's personal property.  When the victim tried to confront the four, he heard a gun being racked with a round in the chamber.  The victim fled.

On February 21, 2011, Sanchez was a member of the Tulare County Sheriff's Department SWAT team.  He was dispatched with the SWAT team to a motel in Tulare to execute an arrest warrant on Avellanoza.  Avellanoza eventually surrendered and was arrested.  A booking information form or classification questionnaire, exhibit 97, was introduced into evidence.  Avellanoza listed on the form that he associated with the Northerner criminal street gang.  Sanchez opined Avellanoza was a member of the Norteño gang based on the three criteria:  he associated with gang members, he was involved in gang-related crime, and he self-admitted gang affiliation in a custodial facility.

### Hypothetical Based on Mirroring of Evidence

Sanchez was asked, hypothetically, if three documented gang members were to kick in the door of someone's residence and start shooting at the victim, including through the walls of the victim's dwelling, would they be doing so in association with the Norteño street gang.  Sanchez replied affirmatively to this question.  Sanchez was asked if after such a shooting a shot-caller told the shooter to go back in "to finish the victim," would the scenario be for the benefit of the Norteño street gang.  Sanchez replied it would be at the direction of the gang.

When asked whether there was a connection to a street gang when the victim had previously reported one of the shooters to law enforcement, Sanchez again replied affirmatively.  Sanchez elaborated, explaining a person cooperating with law enforcement is considered a snitch, and reporting an incident is a sign of disrespect.  The purpose of committing a violent assault is to instill fear to prevent testimony against members of the gang.  A victim who had prior physical altercations with gang members would be in an

21.

ongoing feud, also showing disrespect of the gang member and the gang.  Such a crime would assist, promote, and further the gang based on the fact a message was being sent to the victim, as well as the community, that gang members will not tolerate disrespect.

*Medrano's Defense*

Medrano's mother, C.C., testified the United Farm Workers' flag with the Huelga bird found in Medrano's garage belonged to her.  It previously belonged to her father, who had designed the symbol.  Medrano's mother was unaware of any gang connotation with the image of the bird.  Medrano's friend, Maria S., testified she spent the night of November 25, 2010, Thanksgiving evening, with Medrano.  Maria did not see Medrano the evening of November 24, 2010.

*Martinez's Defense*

Martinez's wife, Jessica Martinez, admitted she had a prior conviction requiring her to register as a gang member.  Jessica Martinez testified she recalled November 24, 2010, because it was her birthday, and she went out to dinner between 5:45 and 6:00 p.m. with her husband, her daughter, and two nieces in Visalia.  The drive to Visalia takes about 40 minutes.  They returned home between 9:00 and 9:30 p.m. that evening.  After leaving the home a few minutes later to get ice cream at Sonic and returning at 9:45 p.m., the family went to bed and Martinez never left the house again that evening.

Martinez's mother, Lupe Tellez, confirmed the activities of Martinez on November 24, 2010, as related by Jessica Martinez.  She believed her son was a member of the Northerner gang.

*Avellanoza's Defense*

Avellanoza's girlfriend, Leonora Penalosa, and her brother, Robert Penalosa, testified for Avellanoza.[3]  During Thanksgiving 2010, Avellanoza was living with the Penalosa family.  Robert and Avellanoza worked at the same place five days a week.  The

---

[3]Because Robert and Leonora Penalosa share the same last name, we refer to them by their first names.  No disrespect is intended.

two would carpool into work in Robert's car. On Thanksgiving morning, Robert and Avellanoza went to work around 5:00 a.m. and returned home between 3:30 and 4:00 p.m. Robert had Thanksgiving dinner with Avellanoza at their home. Robert never saw Avellanoza with weapons or drugs.

Leonora said she dated Avellanoza for about six years. In February 2010, he moved into her home. While he lived with the Penalosa family, Avellanoza worked in the fields with Robert. Avellanoza worked all weekdays. The evening before Thanksgiving 2010, Avellanoza was with Leonora. On Thanksgiving morning, Avellanoza went to work. Leonora knew Medrano and Martinez, but she and Avellanoza did not associate with them. Leonora was aware of arguments Avellanoza had with M.M. Avellanoza never threatened M.M., did not pull a gun on him, there was no gun in the Penalosa residence, and she did not think Avellanoza was a violent person.

On cross-examination by the People, Leonora admitted she was aware from newspaper accounts that Avellanoza was identified as the shooter of a Sureño gang member in Bakersfield who later died. This did not change Leonora's opinion that Avellanoza was not a violent person.

### People's Rebuttal Evidence

Detective Hembree did not recall Martinez or his wife saying anything about going to a Sonic restaurant the evening of November 24, 2010.

Prior sworn testimony from Guillermo Barajas, who was unavailable as a witness at trial, was read into the record. Barajas was with friends and family, including Avellanoza, at The Dome in Bakersfield in 2011. Barajas was "jumped" by several guys and knocked out. Sergeant Martin Heredia with the Bakersfield Police Department investigated the incident. Words were exchanged between Barajas's group and Southerners. They went outside where a fight occurred. Avellanoza was seated in an SUV and fired shots from it as the SUV left the scene. One person was shot and Heredia saw him at the hospital afterward."

23.

**I.    Remand for Resentencing Is Required to Permit Court to Decide Whether to Stay Sentence on Count 2 or Count 4 Pursuant to Section 654**

First, Martinez contends remand is required because the trial court erroneously imposed consecutive sentences on counts 2 and 4, though one should have been stayed pursuant to section 654.  We agree and remand for resentencing.

**A.    Factual Background**

At trial, the jury was instructed that, to prove Martinez was guilty of burglary as charged in count 2, the People were required to prove Martinez entered a building and "[w]hen he entered a building, he intended to commit Assault with a deadly weapon or Attempted Murder."  The jury was instructed it could not find Martinez guilty of burglary unless all the jurors agreed Martinez "intended to commit one of those crimes at the time of the entry."  And, during closing argument, the prosecutor argued in part, with regard to the burglary, that Avellanoza went into the house knowing he was going to shoot someone, and Martinez and Medrano were aiding and abetting.

On July 25, 2022, following our remand and before resentencing, the People filed a brief in which they conceded the burglary (count 2) and assault with a deadly weapon (count 4) "offenses were part of a single objective and course of conduct and that … section 654 applies."  However, at the resentencing hearing, the court imposed sentences on both counts without staying either sentence pursuant to section 654.  The court did not discuss its reasons for imposing consecutive sentences. The probation report also recommends the term on count 2 run consecutive to the term on count 4 without stating any reason.

**B.    Standard of Review and Applicable Law**

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct."  (*People v. Hester* (2000) 22 Cal.4th 290, 294.)  "'"'"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the

24.

meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'"' [Citation.] Intent and objective are factual questions for the trial court, which must find evidence to support the existence of a separate intent and objective for each sentenced offense." (*People v. Jackson* (2016) 1 Cal.5th 269, 354.)

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.) "'The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case.'" (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.) Under this standard, this court must view the evidence in the light most favorable to the trial court's finding and presume the existence of every fact the trial court could reasonably deduce from the record. (*Vasquez*, at p. 737; *People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.)

Former section 654 provided: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a).) Effective January 1, 2022, Assembly Bill 518 amended section 654, subdivision (a) to permit an act or omission punishable under two or more provisions of law to "be punished under either of such provisions." (§ 654, subd. (a); Stats. 2021, ch. 441, § 1.) Thus, under newly amended section 654, a trial court is no longer required to punish the defendant under the longest possible term of imprisonment when multiple offenses are based on the same act or omission. (*People v. White* (2022) 86 Cal.App.5th 1229, 1236.) Rather, the trial court now has "'discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence.'" (*Ibid*.; see *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

## C.    Analysis

Martinez contends section 654 prohibits punishment for both burglary and assault with a deadly weapon in this case; thus, the imposed sentence was unauthorized.  He argues "[t]he court's implicit factual finding of separate intents and objectives is not supported by substantial evidence."  The People agree with Martinez's contention.  They concede the prosecution's theory of guilt for the burglary was that Martinez entered the victim's home with the intent to commit an assault with a deadly weapon or attempted murder.  They assert, at resentencing, the prosecutor even agreed section 654 applied and prohibited Martinez from being punished for both count 2 and count 4.  They also agree remand is required for the trial court to decide which count to stay under amended section 654, which no longer requires the longest term to be designated the principal term.  We, too, agree.

Burglary is the entry into a dwelling with the intent to commit larceny or any felony (§ 459.)  "When a defendant is convicted of burglary and the intended felony underlying the burglary, section 654 prohibits punishment for both crimes."  (*People v. Islas* (2012) 210 Cal.App.4th 116, 130; accord, *People v. Hester*, *supra*, 22 Cal.4th at p. 295 [where assault and burglary were committed with single intent and objective—burglarious entry was perpetrated with the intent to commit felony assault—sentence on assault count should have been stayed under § 654]; *People v. Radil* (1977) 76 Cal.App.3d 702, 713 [concluding one sentence should have been stayed pursuant to § 654 where entry for purpose of assault constituted requisite act for burglary and the entry for purposes of assault and assault itself formed one continuous transaction].)

Here, we agree with the parties the record reflects the intent and objective of both the assault with a deadly weapon and the burglary were the same—burglarious entry was perpetrated with the intent to commit the assault with a deadly weapon—and this was the prosecution's theory of the case at trial.  Accordingly, in light of the evidence introduced at trial, the jury instructions, the prosecutor's arguments at trial evidencing its theory of

the case, and the People's concession below, substantial evidence does not support the trial court's order to sentence Martinez consecutively on these counts. Rather, one of the sentences on count 2 or 4 should be stayed pursuant to section 654. And, because section 654, as amended by Assembly Bill 518, now provides the court with discretion with regard to which sentence will be stayed, remand is necessary for the court to exercise its discretion in modifying Martinez's sentence.

## II. Martinez's Challenge to His Firearm Enhancement Is Moot

Martinez next argues we should direct the court upon remand to strike one of the firearm enhancements in light of amendments to section 1385, subdivision (c) made by the enactment of Senate Bill No. 81 (2021–2022 Reg. Sess.) (Senate Bill 81).

### A. Procedural History

In our previous unpublished opinion we agreed that at resentencing, the trial court should be permitted to exercise its newfound discretion pursuant to section 1385, and decide whether to strike or dismiss (1) the firearm enhancements imposed pursuant to sections 12022.5 and 12022.53 in light of the passage of Senate Bill 620, and (2) the five-year prior serious felony enhancement imposed pursuant to section 667, subdivision (a)(1) in light of the passage of Senate Bill 1393. Resentencing took place on September 20, 2022, after Senate Bill 81 took effect.

Before the resentencing hearing, Martinez filed a brief in anticipation of resentencing in which he asserted section 1385 "mandates that all enhancements beyond a single enhancement in a single case shall be dismissed. Strikes are not enhancements, but five-year serious felony enhancements which are based on the strike allegations cannot be imposed along with firearm enhancements, one or the other 'shall be dismissed.'" He also argued, in light of the passage of Senate Bill 620, the firearm enhancements should be dismissed in furtherance of justice "because there was sparse (if not insubstantial) evidence that [Martinez] was personally armed or that he opened fire

on the victim, who was himself well armed and prepared for anything while in the course of a sophisticated criminal enterprise, who did admittedly open fire and who was therefore not particularly vulnerable." (Fns. omitted.) In the People's brief in advance of resentencing, they argued all applicable enhancements should be imposed at resentencing.

At resentencing, defense counsel argued the court should strike Martinez's strike priors, which were from when Martinez was 17 years old and he was now 43. He asserted, the court has authority to strike "nickel" priors and prison priors in light of changes in the law. He noted, Martinez "was not identified as the person with the firearm" nor identified by the victim in this case "other than running away from the scene."

The prosecution responded that Martinez "is one of the more violent people that have come through this courtroom," noting Martinez's prior and that he was involved in a home invasion robbery during which the person's home was shot up. He asserted Martinez "earned his sentence" and nothing should be stricken from his sentence pursuant to section 1385 because "dismissal of an enhancement would endanger public safety." He contended, "it is quite clear that [Martinez] is an extremely violent person who has no care about others' health and safety, and has more than the normal willingness to commit violence on others."

Defense counsel responded, if the People were really concerned about Martinez's violent behavior, they would have retried him on counts 1 and 5, but they chose not to, and it would be "egregious" for the court to impose strikes from when Martinez was 17 years old.

The court agreed with the prosecutor that Martinez was convicted of serious, violent offenses in that the underlying offense was a home invasion/robbery or burglary during which shootings and "carnage" took place in the home. Based on the number of Martinez's prior convictions, their seriousness, and the seriousness of the underlying

28.

offense, the court denied Martinez's request to strike the strike priors and it initially denied the request to strike "the special allegation for serving for a prior serious felony [*sic*] or being convicted of a prior serious felony under … Section 667(a)(1)." The court noted, despite the age of the priors, Martinez "evidently has continued to commit crimes in that he is now being prosecuted by federal authorities," and it saw "no compelling or other circumstances that would justify striking the strikes or striking the prior convictions."

However, the court then partly changed course, stating it was "mindful of the code in … Section 1385(c)(1), requiring the Court to dismiss an enhancement if there are multiple enhancements alleged in a single case. So I am inclined to strike the enhancement under … Section 667(a)(1), the five-year nickel enhancement pursuant to again, 1385(c)(1)—actually it is Subsection (3), Subsection (b) [*sic*], which requires the Court to do that, and leave in place the other enhancement under … Section 12022.5(a)."

## B.     Applicable Law

Effective January 1, 2022, Senate Bill 81 amended section 1385 in certain respects. As modified by Senate Bill 81, section 1385, subdivision (c) now provides, in part:

> "(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

> "(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances … are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."

The mitigating circumstances courts are to consider and afford great weight to in considering whether to strike an enhancement includes, but is not limited to, whether

"[m]ultiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed."  (§ 1385, subd. (c)(2)(B).)

We note Senate Bill 81 initially codified these provisions under section 1385, subdivision (c)(3)(B), but section 1385 was further amended pursuant to Assembly Bill No. 200 (2021–2022 Reg. Sess.) (Assembly Bill 200), effective June 30, 2022, and this provision was amended to fall under subdivision (c)(2)(B).  (Stats. 2022, ch. 58, § 15.)  Pursuant to Senate Bill 81, section 1385, subdivision (c)(7) provided:  "This subdivision shall apply to sentencings occurring after the effective date of the act that added this subdivision."  (Stats. 2021, ch. 721, § 1.)  Thereafter, Assembly Bill 200 modified subdivision (c)(7) of section 1385 to state, "This subdivision shall apply to all sentencings occurring after January 1, 2022."  (Stats. 2022, ch. 58, § 15.)  Because Senate Bill 81 became effective January 1, 2022, this modification did not result in a substantive change.

As the parties acknowledge, section 1385, subdivision (c), as amended by Senate Bill 81, provides that it shall apply to sentencings occurring after January 1, 2022, the effective date of Senate Bill 81.  Thus, it applied at Martinez's resentencing, and its changes to section 1385 will apply at the new resentencing hearing below.

C.     Analysis

Martinez argues substantial evidence does not support the trial court's conclusion that dismissal of one of his section 12022.5 firearm enhancements would endanger public safety.  Accordingly, he contends the court abused its discretion in failing to strike one of the section 12022.5, subdivision (a) enhancements.  The People assert, because a full resentencing will take place upon remand at which the trial court must exercise its discretion under section 654 regarding what count to stay, it may reconsider all its discretionary sentencing decisions; thus, Martinez's claim regarding his firearm enhancement is moot.  Alternatively, they assert we should not direct the trial court to

dismiss one of the firearm enhancements, and the trial court did not abuse its discretion when it impliedly determined it was not in the furtherance of justice to dismiss either of the firearm enhancements.

We agree with the People that this claim is moot. Because we are remanding for a full resentencing on other grounds, Martinez may raise his argument regarding the court's refusal to strike the firearm enhancements below. And, as the People note, in light of our conclusion in part I, one of the firearm enhancements will necessarily be stayed.

## III. Court May Reconsider Its Decision to Strike the Section 667, Subdivision (a) Enhancements at Resentencing

Martinez contends the stricken prior serious felony enhancement is now "irretrievable." He contends the prosecutor's failure to object to the court's striking of the section 667, subdivision (a)(1) enhancement or to file an appeal on the grounds the court mistakenly believed it was mandatory to strike this enhancement "forfeits the right to raise defects in the order on appeal." The People respond that the forfeiture doctrine is not an exception to the full resentencing rule, and the trial court may impose any appropriate sentence in light of the vacatur of the original sentence. On reply, Martinez argues the People have "not cited any authority to support [the] argument that a superior court has the power to 'reinstate' enhancements after dismissal pursuant to section 1385."

"[T]he full resentencing rule allows a court to revisit *all prior sentencing decisions* when resentencing a defendant." (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425, italics added.) "A court conducting a full resentencing also may, as appropriate, revisit sentencing choices such as a decision to stay a sentence [citation], to impose an upper term instead of a middle term [citation], or to impose concurrent instead of consecutive sentences [citation]." (*Id.* at p. 425.)

Contrary to Martinez's contention, the court is not prohibited from revisiting its decision to strike the section 667, subdivision (a)(1) enhancement at resentencing. Rather, this was a prior sentencing decision that falls within the scope of the full

31.

resentencing rule. So long as the aggregate sentence at resentencing does not exceed that previously imposed, there is no violation of double jeopardy. (See *People v. Hanson* (2000) 23 Cal.4th 355, 357 ["When a defendant successfully appeals a criminal conviction, California's constitutional prohibition against double jeopardy precludes the imposition of more severe punishment on resentencing"].)

## IV. Restitution and Parole Revocation Fines Must be Reduced

Martinez next challenges the restitution fine and corresponding parole revocation fine, asserting both amounts should be reduced to the amounts imposed at the original sentencing hearing.

### A. Relevant Factual Background

The original probation report recommended imposition of $8,000 restitution and parole revocation fines. Defense counsel requested these amounts be reduced, and the original sentencing judge imposed a $4,000 restitution fine (§ 1202.4, subd. (b)) and a $4,000 parole revocation fine (§ 1202.45, subd. (b)).

At resentencing, the revised probation report recommended, and the court imposed an $8,000 restitution fine and an $8,000 parole revocation fine. Defense counsel did not object to the imposition of the increased fines or request an amount lesser than that recommended in the probation report. Defense counsel asked the court that the judgment reflect the restitution fine had been paid and the court directed that the minutes should reflect Martinez was to receive credit for the amount he previously paid. The minute order notes that the defense stated restitution had been previously paid, but the abstract of judgment lists the fines without any mention of credit.

### B. Analysis

Martinez notes the court increased the amount of the restitution (§ 1202.4) and parole revocation (§ 1202.45, subd. (b)) fines at resentencing to $8,000 each when the trial court set these fines at $4,000 at the initial sentencing hearing. He asserts the trial

court was prohibited from increasing these fines under the double jeopardy clause because restitution fines are punishment. He concedes his counsel did not object to the increase in these fines or request a lower amount, but argues his counsel was ineffective in failing to do so. The People agree reduction of these fines to $4,000 each is required. We, too, agree.

In *People v. Hanson*, *supra*, 23 Cal.4th 355, the California Supreme Court concluded the trial court's increase of the defendant's restitution fine from $1,000 to $10,000 on remand for resentencing following the defendant's partially successful appeal from multiple criminal convictions violated the state's constitutional prohibition against double jeopardy. (*Id*. at p. 363.) The *Hanson* court reasoned, the Legislature intended restitution fines as punishment, and California's double jeopardy principles preclude the imposition of more severe punishment on resentencing following a successful appeal. (*Id*. a pp. 361–362.) The *Hanson* court held there is no rational distinction between fines and incarceration in this context. (*Id*. at p. 363.) Rather, "one who appeals an erroneous conviction at the risk of a greater fine is indistinguishable from one who hazards a longer period of incarceration. In both situations, the defendant suffers a penalty for invoking the right to raise that challenge." (*Ibid*.) The court further reasoned, even if the state double jeopardy clause did not compel this rule, the same rule would apply on alternate state due process grounds. (*Id*. at pp. 366–367.)

Thus, it is clear in light of *Hanson*, the court's imposition of a greater restitution fine on remand for resentencing was erroneous and in violation of state double jeopardy principles. At resentencing, the court is directed to reduce the amount of restitution to an amount equal to or less than the amount imposed at the original sentencing hearing— $4,000. And, because the parole revocation fine is to be assessed in the same amount as the restitution fine pursuant to section 1202.45, subdivision (a), the parole revocation fine must also be reduced accordingly. (See § 1202.45, subd. (a) ["In every case where a person is convicted of a crime and his or her sentence includes a period of parole, the

court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4"].)

## V. Custody Credit Contention May be Raised Below

Martinez next asserts the judgment must be amended to reflect that his presentence custody credit applies to the aggregate punishment. He argues his presentence custody credits were credited only to the determinate sentence imposed on count 4 and not credited to the indeterminate sentence imposed on count 2, because the credits are only listed on the determinate term abstract of judgment and not on the indeterminate abstract of judgment. The People assert Martinez received the correct amount of custody credits, which are applied to his sentence as a whole and there is no authority requiring credits to be awarded on both the determinate abstract of judgment and the indeterminate abstract of judgment. Irrespective, they contend Martinez may raise his contention at resentencing.

"Indeterminate term crimes and determinate term crimes are subject to two different sentencing schemes." (*People v. Neely* (2009) 176 Cal.App.4th 787, 797.) Indeterminate sentencing under the three strikes law where a defendant has two prior strikes is governed by section 667, subdivision (e)(2)(A), and sentencing for determinate term crimes is governed by sections 1170 and 1170.1. (§§ 667, subd. (e)(2)(A), 1170, 1170.1.) "Sentencing under these two sentencing schemes must be performed separately and independently of each other." (*People v. Neely*, *supra*, at p. 797.) "Only after each is determined are they added together to form the aggregate term of imprisonment." (*Ibid*.) Section 2900.5 provides for the application of custody credit to a defendant's term of imprisonment: "In all felony … convictions, … when the defendant has been in custody, … all days of custody of the defendant … shall be credited upon his or her term of

34.

imprisonment … in the discretion of the court imposing the sentence." (§ 2900.5, subd. (a).)

The abstract of judgment here consists of two forms—one for an indeterminate sentence (CR-292) and one for a determinate sentence (CR-290). The indeterminate sentence form lists the 25 years-to-life sentence imposed for count 2 (burglary) and the related 10-year sentence for the section 12022.5, subdivision (a) enhancement attached to count 2. Under the section "Credit for Time Served" on the indeterminate sentence form it lists "0" total credits, "0" actual, and "0" local conduct credits. The determinate sentence form lists the term for count 4, but, as the People note, it erroneously lists count 4 as the crime of "1st degree residential burglary," a violation of section 459 when it should be assault with a deadly weapon, a violation of section 245, subdivision (a)(1). It also lists the four-year term for the section 12022.5, subdivision (a) enhancement attached to count 4. On the determinate term abstract, under Credit for Time Served, it lists "4,485" total credits, "4314" actual, and "171" local conduct credits. Martinez does not dispute the correct number of credits were awarded at resentencing.

Here, a new abstract will necessarily issue based upon our remand for resentencing; thus, Martinez's contention is largely moot. But, although we have not found authority requiring custody credit to be denoted in a particular manner on the abstracts of judgment, for purposes of clarity, following the resentencing hearing, the clerk is directed to include the credit for time served on the form that lists the principal term for the unstayed sentence. Additionally, on the other form, the clerk may include a notation under the Credit for Time Served section to refer to the form on which the credit for time served is listed (e.g., "See CR 290" (the determinate sentence form) or "See CR-292" (the indeterminate sentence form)). Additionally, upon issuance of the modified forms, the clerk should ensure the correct crime is listed on each form.

## VI.    Assessments Must Be Updated on Remand

In his final issue, Martinez contends, and the People agree, the imposed court operations assessment and criminal conviction assessment must be reduced.  At resentencing, the trial court imposed a $160 court operations assessment (Pen. Code, § 1465.8) and $120 criminal conviction assessment (Gov. Code, § 70373); the same amounts it imposed at the original sentencing hearing though two of Martinez's convictions had been reversed.

Penal Code section 1465.8 provides a court operations assessment of $40 "shall be imposed *on every conviction for a criminal offense*" with limited exceptions.  (*Id.*, § 1465.8, subd. (a)(1), italics added.)  And Government Code section 70373 provides a $30 court facilities assessment "*shall be imposed on every conviction* for a criminal offense" with limited exceptions.  (*Id.*, § 70373, subd. (a)(1), italics added.)

Here, following Martinez's prior appeal, only two criminal convictions remained.  Thus, the court erred in imposing a $160 court operations assessment and a $120 criminal conviction assessment.  We agree with the parties the court operations assessment should be reduced to $80 and the criminal conviction assessment should be reduced to $60 in light of the remaining convictions.

## DISPOSITION

The sentence is vacated and the matter is remanded to the trial court for a new sentencing hearing to permit the trial court to exercise its discretion regarding which sentence to stay pursuant to section 654 and to conduct a full resentencing.  The court is further ordered to modify the imposed assessments as stated herein and to reduce the restitution fine and parole revocation fine each to $4,000 or less.  In all other respects, the judgment is affirmed.